UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHN ROBINETT, et al.,<br><br>                Plaintiff,<br><br>   v.<br><br>OPUS BANK, et al.,<br><br>               Defendant. | CASE NO. C12-1755MJP<br><br>ORDER ON<br>   1. MOTION TO DISMISS<br>   2. MOTION TO COMPEL<br>   3. MOTION FOR PROTECTIVE<br>      ORDER |

The Court has received and reviewed:

1. Defendants' Motion to Dismiss Consumer Protection Act Claim (Dkt. No. 48), Defendants' Request for Judicial Notice (Dkt. No. 49), Plaintiffs' Response to Motion to Dismiss Consumer Protection Act Claim (Dkt. No. 58), and Defendants' Reply in Support of Motion to Dismiss Consumer Protection Act Claim (Dkt. No. 59);

2. Plaintiffs' Motion to Compel (Dkt. No. 44), Defendants' Response to Motion to Compel (Dkt. No. 50), and Plaintiffs' Reply in Support of Motion to Compel (Dkt. No. 55);

1    3. Defendants' Motion for Protective Order (Dkt. No. 46), Plaintiffs' Response to
2       Motion for Protective Order (Dkt. No. 53), and Defendants' Reply in Support of
3       Motion for Protective Order (Dkt. No. 56)
4  and all attached declarations and exhibits.  Finding that oral argument is not necessary, the Court
5  makes the following rulings:

6       IT IS ORDERED that the motion to dismiss the Consumer Protection Act claim is
7  GRANTED; the Consumer Protection Act claims in the Lead and Related cases are
8  DISMISSED.

9       IT IS FURTHER ORDERED that the request to take judicial notice of the Washington
10 State Bar membership of Plaintiff Martin Robinett is GRANTED.

11      IT IS FURTHER ORDERED that the motion to compel is GRANTED IN PART and
12 DENIED IN PART.

13      IT IS FURTHER ORDERED that the motion for protective order is GRANTED IN
14 PART and DENIED IN PART.

**Background**

Plaintiffs are real estate developers in Snohomish County who had a longstanding financial relationship with Defendant Cascade Bank, a local bank which was ultimately sold to Defendant Opus Bank. Plaintiffs' amended complaint alleges that they had a history of written and oral agreements to extend their loans with Cascade, agreements Plaintiffs claim they were led to understand would continue after the sale to Opus.  That is not what happened: rather than extend their loans, Opus declared Plaintiffs in default.

Thereafter, Plaintiffs filed suit in state court for wrongful foreclosure, slander of title, breach of contract, fraudulent/negligent misrepresentation, negligence, unjust enrichment and

1  violations of the Washington Consumer Protection Act (CPA).  Defendants removed the matter

2  to federal court.

3  **Discussion**

4  Because the motion regarding the CPA claim is partially dispositive of the remaining

5  motions, the order begins with an analysis of the motion to dismiss.

6  <u>Motion to Dismiss the CPA Claim</u>

7  This motion turns on a single issue: are the Plaintiffs eligible to sue under the

8  Washington CPA?  Or are they "sophisticated businesspeople… in a position to protect

9  themselves from exploitation" (Mtn to Dismiss, p. 5) who should not be permitted to avail

10  themselves of the protective mechanism of this statutory mechanism?

11  For resolution of this issue, the Court turns to the seminal case in this area, <u>Hangman

12  Ridge Training Stables v. Safeco Title Ins. Co.</u>, 105 Wn.2d 778 (1986).  This case established the

13  five-element test for eligibility to sue for CPA violations.  In order to establish a CPA claim, a

14  plaintiff must prove all five elements of the violation:

15      1.  An unfair or deceptive act or practice;
    2.  Occurring in trade or commerce;
16      3.  That impacts the public interest;
    4.  Causing injury to business or property which was
17      5.  Proximately caused by the unfair or deceptive act or practice.

18  <u>Id.</u> at 784-85.

19  And the court in <u>Hangman Ridge</u> anticipated the issue that Defendants have raised here:

20  should persons engaged in private business transactions (as opposed to public consumer

21  transactions) be able to utilize the mechanism created by the CPA to seek redress for their

22  injuries?  This question went to the heart of one of the factors created by <u>Hangman Ridge</u> for

23  determining a CPA violation – the alleged wrong must be an unfair or deceptive act or practice

24

occurring in trade or commerce *that impacted the public interest*.  Did an essentially private contract dispute have the potential to affect the public interest?

> Where the transaction was essentially a private dispute… it may be more difficult to show that the public has an interest in the subject matter. Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest.

Id. at 790 (citations omitted).  But the Hangman Ridge court went on to say that the existence of a private contract dispute was not an insurmountable barrier to CPA relief:  "However, it is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest." Id.

Hangman Ridge enunciates a further, four-part analysis to test this likelihood of additional, farther-reaching injury:

> Factors indicating public interest in this context include: (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions? As with the factors applied to essentially consumer transactions, not one of these factors is dispositive, nor is it necessary that all be present.

Id. at 790-91.

The alleged acts were unquestionably committed in the course of Defendant's business. Neither Defendant nor Plaintiffs discuss the second and third factors in their briefing.  The Court notes, however, that there are no allegations in the amended complaint to the effect that Opus either advertised to the general public or actively solicited this particular group of plaintiffs.

The Hangman Ridge court rejected the CPA claims of its plaintiffs partly because they

> … had a history of business experience. They were sole shareholders in a closely held corporation, and they retained an attorney and an accountant on a regular basis. Plaintiffs in this case are not representative of bargainers subject to exploitation and unable to protect themselves.

1  Id. at 794.  Defendants attack Plaintiffs' CPA claims on precisely that basis – that Plaintiffs were

2  a sophisticated group of real estate developers whose financial history with Cascade Bank

3  spanned many years.  Plaintiffs do not deny that they are professional real estate developers with

4  a lengthy history of projects and financial dealings in the area.  They argue that no amount of

5  sophistication could have protected them against the misrepresentations by which they allege

6  they were misled.

7       On the issue of the sophistication or business acumen of the various plaintiffs in this

8  matter, the Court notes that (1) none of the parties have provided the Court with any information

9  from which a legitimate inference about the business expertise of any of the Plaintiffs (or lack

10 thereof) could be drawn, and (2) Plaintiffs' own complaint describes them (as a group) as

11 persons "engaged in the business of developing real estate, including readying the underlying

12 land for construction and the building of new homes for sale" who had a "longstanding and

13 mutually beneficial business relationship with [Defendant] Cascade [Bank] dating back to the

14 late 1990s."  Am. Complaint, ¶ 4.1.  From this allegation, an inference can be drawn that

15 Plaintiffs are at least more sophisticated in the area of real estate development (and the financing

16 thereof) than the average consumer.

17       Further, the Court is permitted to take judicial notice of any adjudicative fact that is "not

18 subject to reasonable dispute" and which "can be accurately and readily determined from sources

19 whose accuracy cannot reasonably be questioned."  FRE 201(b).  Accordingly, the Court grants

20 Defendants' request  and takes judicial notice of the fact that the website for the Washington

21 State Bar Association lists Plaintiff Martin Robinett as an active lawyer in this state, admitted to

22 practice on October 27, 1981.  While the Court again draws no inferences from this fact

23 regarding Martin Robinett's sophistication in the realm of real estate development (beyond that

24

noted above), the Court is aware that one of the main features of Plaintiffs' financial history with Defendant Cascade Bank – a series of verbal loan extensions on various development and construction loans – appears to be a textbook example of a Statute of Frauds violation (*see* RCW 19.36.110) of which any law school graduate could reasonably be expected to be aware. At a minimum, Plaintiff Martin Robinett should have been aware that these verbal loan extensions upon which he and his co-plaintiffs were relying were at least arguably unenforceable.

In addition to finding some level of sophistication on the part of Plaintiffs beyond that of the average consumer, the Court's decision to dismiss the CPA claim is driven by the complete lack of any evidence that Defendants were advertising the services or practices described in the complaint to the general public. The inference which the Court draws from this absence of evidence is that these appear to be highly individualized circumstances in which Plaintiffs found themselves, circumstances which were unique to the singular financial history they had with Defendant Cascade Bank, and circumstances which were unlikely to be repeated elsewhere to which the public would be subjected.

Added to that is an absence of proof that Plaintiffs were solicited in any regard by Defendant Opus Bank. This means that two of the four "public interest" factors outlined in Hangman Ridge are completely absent here, while a third (unsophisticated consumers occupying an unequal bargaining position) tips at least slightly in favor of Defendant. The cumulative weight of all of this must result in a finding that this is not the sort of private business transaction that can be characterized as affecting the public interest in a way that the CPA was intended to address.

On that basis, the Court will grant Defendants' motion to dismiss the CPA claims in the Lead Case and all the Related Cases.

Plaintiffs' Motion to Compel

This dispute centers around three objections Defendant has posed to Plaintiffs' discovery requests:

1. The production of documents and ESI regarding third party borrowers who have been similarly affected by Defendant's lending policies;
2. The production of documents and Electronically Stored Information ("ESI") regarding Plaintiffs' loans which stretches back before January 1, 2011; and
3. The deposition of Opus Bank President and CEO Stephen Gordon.

*Discovery re: Third Party Borrowers*

Defendant argues that "[t]here are no requests for documents relating to other borrowers" in Plaintiffs' discovery materials, therefore Plaintiffs should not be permitted to compel their production. The evidence does not support that argument. Plaintiffs have produced proof of two interrogatories requesting (1) a list of every real estate development loan foreclosure (Interrogatory #3) and (2) every real estate development loan default notice issued after July 1, 2011 (Interrogatory # 4). *See* Reply, p. 3. Additionally, Plaintiffs cite to their omnibus interrogatory requesting "all documents which refer, evidence or relate to the subject matter of this lawsuit" (Interrogatory #65). Id.

As Plaintiffs themselves acknowledge, however, this discovery request must stand or fall on their CPA claims. In light of the dismissal of the CPA claims as decided *supra*, there is no longer any relevance to discovery concerning third party borrowers, and this portion of Plaintiffs' request is DENIED.

*Discovery re: Pre-January 2011 Material*

Plaintiffs complain that Opus is refusing to produce all the evidence in its possession relating to the loans which are issue in this case. Plaintiffs claim (and Opus does not dispute) that Defendant has produced the "hard copy loan files" (Notes, Deeds of Trust) but limited its

production to a cutoff date of January 1, 2010.  Plaintiffs argue that their legal theory centers on a series of agreements with Opus's predecessor, Cascade Bank, which stretch back to the beginnings of their relationship in the 1990s – they believe that evidence of those agreements will be memorialized in the loan files in Defendant's possession.

There appears to be an inconsistency in Plaintiffs' briefing.  Plaintiffs' opening brief describes the material they seek in this regard: "The production of documents and ESI relating to Plaintiffs' loans and which predate January 1, 2011." (Mtn, p. 5).  Plaintiffs go on to complain the Defendants have refused to produce any evidence further back than the year prior to the merger between Cascade and Opus.  They state "Defendant's refusal is arbitrary and unjustified, and Plaintiffs need the electronically stored information because it is directly relevant to their case, specifically as to if loans to Plaintiffs were previously informally renewed."  Id., p. 7.

Defendant responds, arguing the expense of producing the requested ESI.  But in its reply, Pltf contends that

> Opus has already provided hard copies of loan files prior to the January 2010 date and therefore has essentially admitted the information sought is relevant and able to be produced.  Finally, as Opus has argued, the bulk of the cost is the electronic search, not *the copying and production of the existing loan files that Plaintiffs seek*.

Reply, pp. 6-7 (emphasis supplied).  It is not clear to the Court whether Plaintiffs are now limiting their request to hard copy loan files predating the January 2010 cut-off date or are simply saying that the search of the ESI can be limited to material solely concerning "the existing loan files that Plaintiffs seek."  Plaintiffs need to clarify this with Defendants immediately.

Given the centrality of their long history of loan extension agreements with Cascade to their legal theory (*see* Am.Complt ¶ 4.3), the information in the files for these loans is relevant and the expense of locating and copying them is not disproportional to their importance.

ORDER ON MOTIONS - 8

1  Defendant is ordered to produce both the hard copy loan files in its possession and any ESI

2  regarding loan file material for the loans at issue in this lawsuit without regard to the age of the

3  information.

4

5  *Deposition of Gordon*

6  "A strong showing is required before a party will be denied entirely the right to take a

7  deposition." <u>Blankenship v. Hearst Corp.</u>, 519 F.2d 418, 429 (9th Cir. 1975).  That being said,

8  "[v]irtually every court that has addressed deposition notices directed at an official at the highest

9  level or 'apex' of corporate management has observed that such discovery creates a tremendous

10  potential for abuse or harassment." <u>Celerity, Inc. v. Ultra Clean Holding, Inc.</u>, 2007 WL 205067

11  *3 (N.D.Cal., Jan. 25, 2007).

12  In order to curb the potential for abuse, a party seeking an "apex deposition" must

13  establish that the executive

14  [1] has unique, non-repetitive, firsthand knowledge of the facts at issue in the case, and

15  [2] that other less intrusive means of discovery such as interrogatories and depositions of

16  other employees, have been exhausted without success.

17  <u>Salter v. Upjohn Co.</u>, 593 F.2d 649, 651 (5th Cir. 1979).

18  In their moving papers, Plaintiffs cited as their rationale for deposing Gordon an excerpt

19  of a statement made by Gordon where he declared that

20  …Opus Bank will enable small and mid-sized businesses, real estate investors,
    entrepreneurs, and individuals who share our vision to build and expand, to have access
21  to the capital to do so, thereby helping to turn around the region's economy.

22  Mtn, p. 6 (from Amended Complaint, p. 2, § I).  Plaintiffs argue that because he made this

23  statement and "then implemented policies contrary" to this statement and because he "was one of

24

the individuals ultimately responsible for the policies at issue," (Id.), they should be able to depose him.

The Court is not persuaded. Although the source of the Gordon quote above is not identified, the statement is the most generic kind of public relations puffery, more akin to an expression of sentiment than a declaration of policy. Case law abounds with opinions which stand for the proposition that the "mere fact that [a CEO] made public statements, even on issues that [the plaintiff] considers relevant to its claims, are (*sic*) insufficient to justify his deposition." Affinity Labs of Texas v. Apple, Inc., 2011 WL 1753982 at *16 (N.D.Cal. May 9, 2011). *See also* Mulvey v. Chrysler Corp., 106 F.R.D. 364, 366 (D.R.I 1985); Thomas v. IBM, 48 F.3d 478 (10th Cir. 1995); Celerity Inc., *supra* at *5.

In their reply brief, Plaintiffs produce more persuasive evidence – the complaint of a former executive of Opus who is currently suing the bank over his termination. *See* Brennan Complaint, Vail Decl., Dkt. No. 54, Ex. C. Brennan paints a picture of a chief executive who, tiring of the delays and haggling (and oversight) of group decision-making, took the bank's rate policies into his own hands and unilaterally lowered the offering rates on Opus's loans and deposits. Id. at 37-38. It lends some plausibility to Plaintiffs' argument that Gordon's hand was on the tiller of the decision to renege on the alleged commitments made by Cascade and Opus to Plaintiffs, but it is too little, too late.

"Too late" in the sense that Plaintiffs will not be permitted to present evidence in a reply brief that they clearly could have produced in their opening brief, and thus given Defendant a chance to rebut. "Too little" in the sense that, even with the Brennan evidence, Plaintiffs have not really satisfied the Salter test and come forward with any actual evidence that Gordon has

"unique, non-repetitive, firsthand knowledge" of the circumstances surrounding their loans[1] or any proof that "less intrusive means of discovery" had been tried without success.

The Court is not satisfied that Plaintiffs have established the predicates for deposing the Opus CEO. That portion of their motion to compel will be denied.

<u>Defendant's Motion for Protective Order</u>

Defendant's motion for a protective order is basically a "second bite of the apple;" Defendant reiterates its reasons why it should not be compelled to produce the evidence Plaintiffs have requested; Plaintiffs reiterate their arguments why the evidence should be produced. The Court will partially grant and partially deny the motion for protective order on the same grounds as articulated for the motion to compel *supra*.

**Conclusion**

Plaintiffs have failed to establish that their Consumer Protection Act claims affect the public interest as required by Ninth Circuit precedent and Defendants' motion to dismiss those claims will be GRANTED. While Plaintiffs have proven that they are entitled to the evidence regarding the files of the loans at issue dating back to their inception, they have not proven that they are entitled to discovery concerning third party borrowers or that they should be allowed to depose Opus President and CEO Gordon. The motions to compel and for a protective order will be PARTIALLY GRANTED and PARTIALLY DENIED in accordance with those findings.

---

[1] In fact, the Brennan Complaint goes on to state that, although Gordon "said that senior management should start immediately to identify additional sources of cost reductions," he "did not mention reducing the loan volumes…" <u>Id.</u> at p. 38.

1  The clerk is ordered to provide copies of this order to all counsel.

2  Dated October _30_, 2013.

*[signature]*

Marsha J. Pechman
United States District Judge

ORDER ON MOTIONS - 12